**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 28 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MAUDIE BEAIRD, MILDRED
BOBO, JERLENE BUSH, ROSA
CLARK, WILLIAM HENSON,
CLAUDIA JOHNSON, MARGARET
JONES, RUTH NORAN,

    Plaintiffs - Appellants,

  and

MARJIE FERGUSON, LEONARD
FLANNERY, THOMAS FUNG,
GERALD LECOMPTE, SHIRLEY
MCCARTNEY, DIANNA G. WOODS,

    Plaintiffs,

v.

SEAGATE TECHNOLOGY, INC.,

    Defendant - Appellee.

Nos. 96-6087 and 96-6145

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-94-1473-M)**

---

Mark Hammons, Hammons & Associates, Oklahoma City, Oklahoma, for
Plaintiffs - Appellants.

Gary C. Pierson (Tony G. Puckett and Mark D. Spencer with him on the briefs),
Lytle Soulé & Curlee, Oklahoma City, Oklahoma, for Defendant - Appellee.

Before **TACHA** and **LUCERO**, Circuit Judges and **DANIEL**[*], District Judge.

**LUCERO**, Circuit Judge.

This case arises from a reduction in force ("RIF") instituted in 1993 by defendant Seagate Technology, Inc., a manufacturer of computer equipment. As a result of the RIF, more than 200 employees at Seagate's Oklahoma City facility were laid off. Many of the laid-off employees had worked at the Oklahoma City facility for more than a decade. Some of the plaintiffs in this case had more than twenty years seniority when they were let go. Twenty-seven former employees sued Seagate for violation of various federal and state antidiscrimination laws. Some of the plaintiffs voluntarily dismissed their claims, and the district court granted Seagate summary judgment as to most of the others. The judgment became final when the remaining plaintiffs settled and the district court entered a final judgment. Eight plaintiffs remain parties to this appeal.

Plaintiffs raise two distinct objections to summary judgment. First, they argue that it was reversible error to allow Seagate to submit a reply brief with additional materials after plaintiffs had responded to Seagate's original summary

[*] Honorable Wiley Y. Daniel, United States District Judge for the District of Colorado, sitting by designation.

judgment motion, but not to permit plaintiffs to file a surreply controverting the arguments and materials contained in the reply. Second, they contend that questions of material fact remain with respect to each plaintiff and that summary judgment was thus improper.

## I

In 1993, Seagate decided to reorganize its Oklahoma City facility and reduce the number of employees working there. According to the RIF procedures described in Seagate's employee handbook, "[i]n determining which employees will be subject to a reduction in force, the Company will take into account, among other things, operational requirements, performance and potential. Where these factors are equal, length of service will be taken into account." See Appellants' App. at 228.

In an affidavit submitted to the district court, Seagate's Director of Human Services, Lowell Yandell, elaborated on this scheme. According to Yandell, operational requirements dictated the total number of employees to be cut within each job code. Thereafter, employee performance determined which employees would number in the final lay-off total. Where one employee's performance ranking was equal to another's, length of service was used as a tiebreaker. If two employees had identical seniority, the employee born on the earliest day of the month was selected first.

For purposes of the RIF, Seagate measured performance in two ways. Employees who had recently been subject to formal disciplinary proceedings were chosen for lay-off before any other employee within their job code.[1] If there were no such documented disciplinary actions, Seagate stated that it considered the employee's most recent written performance evaluation rating, which was measured on a scale of one to five. For all plaintiffs, the most recent written performance evaluations were compiled in a "CHAPA" report, dated July 26, 1993, that also lists the date of their final evaluation. In some cases, employees were evaluated on a zero-to-500 point scale that was converted into a performance evaluation corresponding to the CHAPA one-to-five scale.

Plaintiffs alleged principally that the RIF, as applied to them, was a pretext for illegal discrimination. Seagate moved for summary judgment, asserting that all lay-off decisions were made in strict accordance with the RIF guidelines outlined above. In response, plaintiffs disputed that contention by introducing a Seagate evaluation document as their Exhibit 53. Plaintiffs argued that this document showed they should have been retained in place of employees who were not laid off; that the RIF criteria, including potential and disciplinary history, were used selectively; and that strict seniority was not applied.

---

[1] This performance criterion was defined as encompassing employees who had received "first warnings" within 90 days of the RIF selections or had received more serious discipline within one year of the RIF. See Appellants' App. at 220.

The district court then allowed Seagate to file a reply brief, in which it explained the preliminary nature of Exhibit 53 and reiterated that the RIF criteria had been consistently applied. Plaintiffs moved to strike Seagate's reply brief or, in the alternative, to file a surreply. The district court denied both motions. Thereafter, the district court granted Seagate summary judgment with respect to all of the appellants. As to appellants Clark, Bush, Bobo and Henson, the district court concluded that a prima facie case of discrimination had not been made. With respect to all eight appellants, it concluded that Seagate's RIF was a legitimate nondiscriminatory reason for termination and that appellants had failed to carry their burden of presenting facts that would allow a factfinder to conclude that the RIF was applied in a pretextual manner. Eight plaintiffs timely appealed.

## II

Appellants first argue that the district court committed reversible error in allowing Seagate to file a reply after plaintiffs responded to Seagate's motion for summary judgment, while denying plaintiffs the opportunity to file a surreply. The substance of Seagate's reply is in three parts: (1) the existence of performance point totals inconsistent with the performance ratings used in the RIF had no effect on plaintiffs' selection for the RIF; (2) plaintiffs' previous attack on the use of potential as a criterion for RIF consideration now precludes assertions that the RIF did not properly consider potential; and (3) the voluntary dismissal of

discrimination claims by many of the plaintiffs suggests the remaining plaintiffs likewise have no valid claims.

The parties disagree as to what standard of review we should apply to the district court's decision to allow a reply brief. Appellants argue that we should review the district courts's decision de novo. They contend that the district court's error is jurisdictional and, thus, requires reversal regardless of any showing of prejudice. Additionally, appellants argue that some of their number were in fact prejudiced by the district court's reliance on new material to which they had no opportunity to respond. Seagate contends that we should review the district court's decision only for an abuse of discretion. Seagate argues that the district court acted within its discretion in allowing the company to file a reply brief without allowing plaintiffs a surreply and, further, that no unfair prejudice occurred as a result of the district court's consideration of Seagate's reply.

Federal Rule of Civil Procedure 56 implicitly requires the district court to allow the nonmoving party an opportunity to respond before summary judgment is entered against it. See Fed. R. Civ. P. 56(c) ("The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits."); Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice

that she had to come forward with all of her evidence."). In our circuit, "[i]t is settled law that noncompliance with the time provisions of Rule 56(c) deprives the court of authority to grant the motion for summary judgment unless the opposing party has waived this requirement." Osbakken v. Venable, 931 F.2d 36, 37 (10th Cir. 1991). Here, appellants analogize Seagate's reply to an initial summary judgment motion, and suggest that the district court had no authority to grant summary judgment without allowing plaintiffs the opportunity to respond to the new materials.

Rule 56 neither authorizes nor forbids a reply brief by the party moving for summary judgment. In the absence of a specific federal rule, the Federal Rules of Civil Procedure permit federal judges to regulate practice "in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and local rules of the district." See Fed. R. Civ. P. 83(b). Under the local rules of the Western District of Oklahoma, authorized under Fed. R. Civ. P. 83(a), "[r]eply . . . briefs are not encouraged and may be filed only upon application and leave of Court." LR7.1(g) (1997). In this case, the district court's actions are properly viewed as stemming from the authority granted by Rule 83.

Although there is no clear statutory prescription as to the standard of appellate review, the permissive language of Local Rule 7.1(g) and of both provisions of Federal Rule 83 implies that we must give the district court

appropriate deference on appeal.  See Pierce v. Underwood, 487 U.S. 552, 558-59 (1988).  Moreover, "[i]t is especially common for issues involving what can broadly be labeled 'supervision of litigation' . . . to be given abuse-of-discretion review."  Id. at 558 n.1.  The question presented here, that of determining whether the district court may consider evidence and issues raised by the party moving for summary judgment in a reply brief without allowing the opposing party to respond, fits best within this "supervision of litigation" framework. Consequently, we review the trial court's managing its docket and supervising the parties in this respect for an abuse of discretion only.  Cf. Walter v. Morton, 33 F.3d 1240, 1244 (10th Cir. 1994) (holding trial court did not abuse its discretion by denying summary judgment without giving movant opportunity to file reply brief).

Under the abuse of discretion standard, "a trial court's decision will not be disturbed unless [we have] a definite and firm conviction that the lower court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  McEwen v. City of Norman, 926 F.2d 1539, 1553-54 (10th Cir. 1991) (quoting United States v. Ortiz, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)).  Appellants contend that the district court had no "permissible choice" but to allow a surreply once it had accepted the materials in Seagate's reply.  That contention is incorrect.  Having accepted the reply brief, the district court in fact

had two permissible courses of action. It could either have permitted a surreply or, in granting summary judgment for the movant, it could have refrained from relying on any new material contained in the reply brief.

Rule 56(c) requires the nonmoving party to be given notice and a reasonable opportunity to respond to the movant's summary judgment materials. See Celotex, 477 U.S. at 326 (holding that summary judgment is to be entered only if nonmovant on notice that it must come forward with all its evidence); Osbakken, 931 F.2d at 37 (holding that purpose of ten-day period in Rule 56(c) is to provide nonmovant with opportunity to prepare defense to summary judgment). Thus, when a moving party advances in a reply new reasons and evidence in support of its motion for summary judgment, the nonmoving party should be granted an opportunity to respond. See Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 410 (1st Cir. 1985). However, if the district court grants summary judgment for the movant without relying on the new materials and arguments in the movant's reply brief, it does not abuse its discretion by precluding a surreply.

The issue is not jurisdictional. It is true that under Rule 56(c) a court lacks authority to enter summary judgment until ten days have run from the filing of the motion. But once that requirement has been met and the motion is at issue, the court does not lose jurisdiction simply because it accepts a reply brief from the

movant. Rule 56(c) simply requires that if the court relies on new materials or arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials. See id.

In this case, we are not convinced that the district court relied on any new materials or arguments contained in Seagate's reply brief. We need not resolve the issue definitively, however, because we conclude that the district court should not have granted summary judgment as to any of the appellants even on the basis of all the evidence and arguments before the court. Had the district court abused its discretion in refusing the appellants an opportunity to respond to any reply brief materials or argument, it would not affect our decision today.

### III

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the district court's decision to grant summary judgment, we view the evidence in the light most favorable to the nonmoving party. Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). The substantive law at issue determines which facts are material in a given case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

All eight appellants raise claims of age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634. We assess these claims under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To make out a prima facie case of discriminatory discharge under the ADEA, a claimant affected by a RIF must prove: (1) that she is within the protected age group; (2) that she was doing satisfactory work; (3) that she was discharged despite the adequacy of her work; and (4) that there is some evidence the employer intended to discriminate against her in reaching its RIF decision. See Ingels v. Thiokol Corp., 42 F.3d 616, 621 (10th Cir. 1994). The fourth element may be established "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the [RIF]." Id.

Establishing a prima facie case of age discrimination under the ADEA creates a presumption of discriminatory intent that the defendant may rebut by asserting a facially nondiscriminatory reason for the employee's termination. Id. The plaintiff may then resist summary judgment if she can present evidence that that proffered reason was pretextual, "i.e. unworthy of belief," see Randle v. City

of Aurora, 69 F.3d 441, 451 (10th Cir. 1995), or otherwise introduces evidence of illegal discriminatory motive, see id. at 453.[2]

Five of the plaintiffs—Beaird, Bobo, Bush, Clark and Johnson—also argue that their inclusion within the RIF was the product of intentional racial discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1), and 42 U.S.C. § 1981.  In addition, Beaird asserts that her discharge constituted gender discrimination in violation of Title VII.  All these claims are assessed under the same McDonnell Douglas order of proof.  See Branson, 853 F.2d at 770 (ADEA and Title VII claims both subject to McDonnell

---

[2]    The dissent takes extensive issue with this standard.  Nonetheless, the Randle standard is well-established in this Circuit, and Randle itself provides a clear and reasoned refutation of the dissent's argument.  Indeed, the dissent's Henson hypothetical, see Dissent at 5-6, illustrates how easy it is to fall into error once Randle's clear prescription is abandoned.  According to the dissent, it would not be reasonable to allow Henson's case to proceed to a jury on a showing of pretext had Henson been the only employee of the nine terminated from his job code who was over 40 years old.  But Seagate's treatment of other employees does not have the force that the dissent imagines.  After all, Seagate may have instituted a RIF and fired the other eight employees pursuant to that RIF, both for legally valid reasons, and yet have decided to add Henson to that legitimate RIF list for entirely illegitimate reasons.  Furthermore, Seagate's treatment of other employees cannot as a matter of law invalidate the otherwise reasonable inference that it discriminated against Henson.  See Furnco Constr. Corp. v. Waters, 438 U.S. 567, 579 (1978).  At summary judgment, the lay-off of eight younger employees simply cannot explain away the legitimate inference of mendacity to be drawn from the fact that Seagate claimed Henson's firing was operationally necessary while at the same time hiring four other people to do the same job.  See infra at 37.  It may make discrimination a less likely cause of Henson's termination, but the dissent does not explain why it renders discrimination a legally impermissible conclusion.

Douglas indirect method of proof); Randle, 69 F.3d at 450 (assessing § 1981

claims under McDonnell Douglas framework).

## A

The district court ruled that four of the plaintiffs—Bobo, Bush, Clark and

Henson—failed to establish prima facie cases of age discrimination. The district

court also ruled that three plaintiffs—Bobo, Bush and Clark—failed to establish

prima facie cases of racial discrimination. There is no apparent dispute on appeal

that these plaintiffs each established the first three elements of a prima facie case

of race and age discrimination.[3] The district court appears to have based its

decision on the fourth element—that is, that none of these employees had shown

Seagate treated them less favorably than their younger or nonminority

counterparts. See Appellants' App. at 1082-84, 1093. We disagree. Although

this circuit has not fully defined the fourth element of a prima facie case of

discrimination in the context of a RIF, that element was more than satisfied as to

each of these plaintiffs.

---

[3]     All four were members of the relevant protected groups. Bobo, Bush and Clark all scored threes on the CHAPA report, indicating their work met Seagate's requirements. Henson was given a rating of two on the CHAPA report indicating that his work nearly met requirements. Nevertheless, Henson insists that his work was satisfactory, see Appellants' App. at 897, which is sufficient to satisfy this element of the prima facie case, see MacDonald v. Eastern Wyo. Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991). Finally, all four were discharged.

- 13 -

Our most complete statement of the fourth element to date is <u>Branson</u>, which holds: "Evidence that an employer fired qualified older employees but retained younger ones in similar positions is sufficient to create a rebuttable presumption of discriminatory intent . . . ." <u>Branson</u>, 853 F.2d at 771. We have not further described such evidence, thus leaving unanswered such questions as whether a single younger employee retained in a similar position is sufficient to establish the fourth element, or how similar a position must be in order to be relevant under <u>Branson</u>. To do so, we return to <u>Branson</u>'s fundamental fourth-prong requirement that the plaintiff introduce "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." <u>Id.</u> (quoting <u>Williams v. General Motors Corp.</u>, 656 F.2d 120, 129 (5th Cir. 1981)). To interpret this standard, we look in turn to the basic function of the plaintiff's prima facie case within the <u>McDonnell Douglas</u> order of proof, mindful that the burden-shifting framework "allows victims of age discrimination to prevail without presenting <u>any</u> evidence that age was a determining factor in the employer's motivation." <u>La Montagne v. American Convenience Prods., Inc.</u>, 750 F.2d 1405, 1409-10 (7th Cir. 1984).

A prima facie case of discrimination is one sufficient to raise a presumption of intentional discrimination. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993). Left unanswered by the defendant, that presumption mandates a finding

of intentional discrimination, see id., because a prima facie case "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection," Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981), namely a "lack of qualifications or the absence of a vacancy in the job sought," International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977).  More specifically, the second element of the McDonnell Douglas prima facie case—that the plaintiff be "qualified," McDonnell Douglas, 411 U.S. at 802—and the fourth element—that the "position remained open," id.—perform this elimination role.  "Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one."  Teamsters, 431 U.S. at 358 n.44.

The prima facie case raises an inference of discrimination precisely because once the two most common nondiscriminatory reasons for an adverse employment decision are eliminated, that decision, "if otherwise unexplained, [is] more likely than not based on the consideration of impermissible factors."  Burdine, 450 U.S. at 254 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).  Thus, the fourth element of Branson should be understood to parallel the fourth element of McDonnell Douglas by eliminating "lack of vacancy" as a legitimate nondiscriminatory motive for the employment decision.  Once the first three elements have been satisfied, that elimination is all that is required to give rise to

- 15 -

a prima facie case.  See Branson, 853 F.2d at 771 n.5 (indicating no higher quantum of proof required to establish a prima facie case in RIF situation).  The language used in Branson should not be understood to require a plaintiff to produce evidence that age was a determining factor in the employer's motivation.  Such an understanding would effectively fuse the prima facie and pretext steps of McDonnell Douglas and "obviate[] the central purpose behind the McDonnell Douglas method, which is to relieve the plaintiff of the burden of having to uncover what is very difficult to uncover—evidence of discriminatory intent." Oxman v. WLS-TV, 846 F.2d 448, 454-55 (7th Cir. 1988).

Of course, in a RIF case, the plaintiff cannot actually point to a continuing vacancy because her position has been eliminated.  She can, however, point to circumstances that show that the employer could have retained her, but chose instead to retain a younger employee.[4]  In such circumstances, "lack of vacancy" cannot explain the contested employment decision because the employer prefers

---

[4]    The younger employee need not be outside the ADEA-protected class.  See O'Connor v. Consolidated Coin Caterers Corp., 116 S. Ct. 1307, 1310 (1996).  But the younger employee cannot be insignificantly younger because evidence that such an employee was retained would be insufficient to create an inference of illegal discrimination.  Id.  For purposes of convenience, we refer to "younger" employees where we mean "not insignificantly younger" employees.

Of course, with reference to prima facie cases of race and gender discrimination, the plaintiff need only point to members of the opposite sex or of different races.  Again, for purposes of convenience, our analysis of a plaintiff's prima facie case in the RIF context addresses ADEA claims—but it is entirely applicable to gender- and race-based claims as well.

to retain a younger employee in a position for which the plaintiff is qualified. Even though certain exigencies of RIF cases may explain the employer's action in such circumstances, "these exigencies are best analyzed at the stage where the employer puts on evidence of a nondiscriminatory reason for the discharge." Branson, 853 F.2d at 771.

For instance, a plaintiff who is fired pursuant to a RIF and who held a similar position to a younger retained employee can satisfy the fourth element. See Krause v. Dresser Indus., Inc., 910 F.2d 674, 677 (10th Cir. 1990) (holding that prima facie case established where employer fires fifty-two year old accountant pursuant to RIF, but retains one younger employee in similar position); Herold v. Hajoca Corp., 864 F.2d 317, 320 (4th Cir. 1988); Branson, 853 F.2d at 771 ("Evidence that an employer fired qualified older employees but retained younger ones in similar positions is sufficient to create a rebuttable presumption of discriminatory intent and to require the employer to articulate reasons for its decision."). The company's decision to reduce its workforce does not in itself legitimate the employer's choice to fire the employee from the protected class rather than the younger employee. "Lack of vacancy" is thereby

eliminated as a nondiscriminatory explanation for that plaintiff's dismissal and, assuming the first three elements are met, a prima facie case has been shown.[5]

Here, the evidence in the record establishes that for each of the four plaintiffs noted above, at least one younger and/or nonminority employee was retained in the same job code. For example, in job code 1433, to which Bobo, Bush and Clark all belonged, Terry Smith, a white thirty-seven year-old employee was retained. See Appellants' App. at 172-73. In job code 276X, to which Henson belonged, numerous younger employees were retained. See id. at 208-09. Under Rule 56(c), a movant for summary judgment has the burden of "pointing out to the district court . . . [the] absence of evidence to support the nonmoving party's case." See Celotex, 477 U.S. at 325. With regard to the prima facie case, the movant in this case was unable to carry its burden.

**B**

Seagate advances the RIF and its implementing criteria as a facially nondiscriminatory reason for its decision to lay off the plaintiffs. The company has therefore met its burden under the second step of McDonnell Douglas. See Furr v. Seagate Technology, Inc., 82 F.2d 980, 985 (10th Cir. 1996), cert. denied,

---

[5] The fired employee can make a prima facie case without showing she is as or more qualified than employees who are retained. To the extent the district court suggested otherwise, see Appellants' App. at 1093, it was in error. See Branson, 853 F.2d at 771 n.6.

117 S. Ct. 684 (1997). In a RIF case, a plaintiff can demonstrate pretext in three principal ways.[6]

First, she can argue that her own termination does not accord with the RIF criteria supposedly employed. In this case, certain appellants contend that had employee potential been considered according to the employer's own RIF formula, they would have been retained. This kind of evidence can in some cases suffice to substantiate pretext. See Christie v. Foremost Ins. Co., 785 F.2d 584, 586-87 (7th Cir. 1986) (holding that failure of defendant to comply with its own RIF policy allowed jury to conclude RIF was pretextual). But minor inconsistencies in the application of RIF criteria may be too insubstantial to allow a reasonable jury to infer that the RIF was pretextual. See Lucas v. Dover Corp., 857 F.2d 1397, 1402 (10th Cir. 1988).

Second, a plaintiff can adduce evidence that her evaluation under the defendant's RIF criteria was deliberately falsified or manipulated so as to effect her termination or otherwise adversely alter her employment status. See, e.g., Gustovich v. AT & T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992) ("To make progress, the plaintiffs had to come up with evidence implying that the performance evaluations had been 'cooked' in order to do in the older workers.").

---

[6]    We do not foreclose other methods of demonstrating pretext. Most plaintiffs' arguments, however, will fit within the typology discussed below.

All the appellants in this case make claims of this kind. One method of demonstrating manipulation or falsification of evaluation is to produce evidence that a supervisor responsible for assessing her performance displayed ageist animus.

Third, a plaintiff can adduce evidence that the RIF is more generally pretextual. For instance, a plaintiff may establish that an employer actively sought to replace a number of RIF-terminated employees with new hires. Bush, Bobo and Henson all bring claims of this nature. Statistical evidence may, in certain circumstances, be relevant to this purpose. See Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991). Contrary to defendant's argument, however, statistical evidence cannot defeat the pretext claim of an individual plaintiff where the plaintiff's case rests on non-statistical evidence. "A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." Furnco, 438 U.S. at 579.

1.    Ruth Noran

Noran is the only appellant fired from job code 1432. Seagate claims that she was fired pursuant to operational requirements that dictated the lay-off of ten employees from that job code. As the only employee from this job code with a score of two on the CHAPA report, she was selected first for termination.

There are two pieces of evidence in the record that together support a finding of pretext in this case: (1) plaintiffs' Exhibit-53; and (2) a final performance evaluation dated April 19, 1993. Exhibit 53, submitted by plaintiffs in response to Seagate's motion for summary judgment, is an undated document headed "Employees Identified for RIF Using Statewide Pooling." For Noran's job code, it lists eleven employees ranked in ascending order according to their performance points evaluation. Noran is listed third, with a total of 240 points. See Appellants' App. at 795.

Of the eleven listed, only four were in fact laid off. According to Seagate, the evaluations listed in Exhibit 53 were irrelevant because the final performance criterion selected for purposes of the RIF was performance grade rather than performance points. Additionally, Seagate claims that Noran's case was appropriately dismissed because, by the time final RIF decisions were made, Noran's performance rating listed in Exhibit 53 had been replaced by a later and lower review, which scored Noran at 180 points for a CHAPA performance grade of two.

Noran cannot defeat summary judgment by claiming that she would have been retained if different RIF criteria had been used. Seagate may choose to conduct its RIF according to its preferred criteria of performance—that is, performance grade as opposed to performance points—and we will not disturb

that exercise of defendant's business judgment. See Doan v. Seagate Technology, Inc., 82 F.3d 974, 978 (10th Cir. 1996), cert. denied, 117 S. Ct. 684 (1997). That is so even if it appears to Noran that the points scale would have represented a better tool of performance evaluation. The ADEA does not require Seagate's business decisions to be wise—just nondiscriminatory. See Lucas, 857 F.2d at 1403.

But this principle does not immunize all potential "business judgments" from judicial review for illegal discrimination. See Sanchez v. Philip Morris Inc., 992 F.2d 244, 247 (10th Cir. 1993) (when employer invokes business judgment rule in discrimination context, "[t]he reality of the entire situation must be examined"). Such a doctrine would defeat the entire purpose of the ADEA. See Montana, 869 F.2d at 106; Graefenhain v. Pabst Brewing Co., 827 F.2d 13, 21 & n.8 (7th Cir. 1987), overruled on other grounds by Coston v. Plitt Theaters, Inc., 860 F.2d 834 (7th Cir. 1988). There may be circumstances in which a claimed business judgment is so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination. See Sanchez, 992 F.2d at 247; Thornbrough v. Columbus & Greenville R.R., 760 F.2d 633, 647 (5th Cir. 1985), overruled on other grounds by Hicks, 509 U.S. 502; Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n.6 (1st Cir. 1979). Without more, however, the choice

of performance grade over points cannot reasonably be thought to evidence pretext. There is simply no inference of foul play about that choice.

But Noran does more than question that choice. She argues further that Exhibit 53 shows that Seagate improperly manipulated her final CHAPA performance evaluation, which gave her 180 points for a two rating, in order to ensure her termination. Under the RIF criteria, had Noran's 240 point score stood unaltered, she would have had a CHAPA score of three and been retained. Of course, Noran cannot establish pretext by demonstrating the mere opportunity for manipulation. To allow her to do so would effectively—and incorrectly—require a defendant to prove nondiscrimination. Here, however, Noran has produced further evidence that raises the necessary inference of manipulation.

The record contains a final performance evaluation of Noran dated April 19, 1993. See Appellants' App. at 265. But she did not receive its results until July 26, 1993, see id. at 172, 895, three days after Seagate had conclusively decided to terminate her, see id. at 775. Even that might only point to the opportunity for employer misconduct but for the fact that the relevant portion of Exhibit 53, which lists her as having 240 points, was evidently compiled on or after June 28, 1993. See id. at 172, 795 (showing that Exhibit 53 contains point scores for Owens, Lashley and McCartney, all of which are dated June 28, 1993, on the CHAPA table). In other words, more than two months after Seagate claims

to have completed the 180-point/grade-two performance evaluation that ostensibly led to Noran's termination, the company was describing her on internal documents as having 240 points. That latter score would have resulted in a grade-three CHAPA ranking and Noran's retention. One legitimate inference is that Seagate resolved to alter the score for Noran's April evaluation <u>after</u> June 28, 1993. That legitimate inference of purposeful manipulation is sufficient to permit a jury to find pretext.[7] Thus, there are genuine issues of material fact that preclude the entry of summary judgment against Noran.

2.      Rosa Clark

Clark is one of four appellants fired from job code 1433. Seagate claims that operational requirements called for fifteen lay-offs in this job code. Clark received a performance grade of three on the CHAPA report. Because no employee in her job code scored lower, Seagate identified those to be laid off in reverse order of seniority. With 22.77 years of credited seniority, Clark was terminated as the tenth most junior employee with a three rating.

---

[7]      The dissent's alternative inference—that "Exhibit 53 contains mistakes and inconsistencies that any preliminary document would contain when a business is attempting to compile large amounts of data on its workforce," Dissent at 11—is certainly permissible, but it is not our role to chose among reasonable inferences. <u>See</u> <u>Brown v. Parker-Hannifin Corp.</u>, 746 F.2d 1407, 1411 (10th Cir. 1984) ("Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment."). Nowhere does the dissent explain why an inference of purposeful manipulation is per se unreasonable.

Clark attempts to rely on Exhibit 53, which indicates that she would have been retained had Seagate chosen to rely on points alone to identify lay-offs.[8] As noted above, we agree with Seagate that its choice of performance criteria cannot properly evidence pretext.

Nor is Clark's opinion that discrimination was pervasive at Seagate sufficient to establish pretext. Without specific examples of such discrimination, Clark's views are "mere conjecture" and, thus, an insufficient basis on which to deny summary judgment. See Branson, 853 F.2d at 772. From the record before us, the instances of claimed discrimination that she does describe, such as her mistreatment by a supervisor, can only be speculatively attributed to discriminatory animus, and "speculation . . . will not suffice for evidence." Doan, 82 F.3d at 977.

Clark's final argument for pretext is based on a comparison between herself and Mary McCartney, a white employee retained in job code 1432. Had the two employees been in the same job code, McCartney would have been laid-off before Clark because she scored a three in her final performance evaluation and was the less senior of the two. Seagate argues that comparisons across job codes are not

---

[8]    She also notes that certain employees within her job code were retained despite having lower point scores. Michelle Tucci, for instance, was a younger, white employee in job code 1433, who was retained despite having only 270 points—30 points fewer than Clark—on her final appraisal. See Appellants' App. at 173.

probative of pretext because employees in different codes are not similarly-situated. The company insists that it is the plaintiffs' obligation to show that Seagate's pooling of employees into job codes for purposes of the RIF was not justified.

Seagate is not entirely correct. When an employer's RIF criteria include job categorization, an employer must explain the basis for that categorization or risk a finding of pretext. Cf. Bell v. AT & T, 946 F.2d 1507, 1511 (10th Cir. 1991) (recognizing that where employer decides to limit RIF to certain groups, it is incumbent on employer to explain reason for that limitation). "Otherwise, a sophisticated employer could immunize itself from liability by placing a minority employee in a group with employees with greater seniority while banding all other employees with less seniority in another group not at risk of termination. In that situation, it is not the process of ranking within the groups that is suspect, but instead the formation of the groups itself." Id. The same principle logically extends to the present instance in which the employer pooled employees into job codes and then determined the number of lay-offs to be made in each job code before identifying the employees to be let go.

Seagate has proffered a reason for its categorization. Operational requirements dictated that the company reduce the number of employees performing certain job functions. Thus, Seagate claims, employees were

categorized according to job codes in which every employee "performed essentially the same set of tasks." See Appellants' App. at 315. Seagate having offered that reason, it becomes plaintiffs' burden to show that comparisons across job codes are to similarly-situated individuals. See Furr, 82 F.3d at 988; Doan, 82 F.3d at 979. To do so, plaintiffs must show that they "essentially did the same type of work" as the employees they point to for purposes of comparison. See Fallis, 944 F.2d at 745. That showing would demonstrate that the employer's categorization by job code was pretextual.

To meet this burden, Clark suggests that Seagate itself admitted the legitimacy of her comparison to McCartney. In its CHAPA report, Seagate lists McCartney's job code, 1432, as "Shpg/Rec Str Clk A," see Appellant's App. at 172, and Clark's job code, 1433, as "Shpg/Rec Str Clk Sr," id. Appellants argue this shows that job code 1432 consists of higher job grades[9] of the same job classification, and that both codes contain employees "performing the same duties." Appellants' Reply Br. at 17; see Appellants' App. at 441. That may be the case, but we doubt that the mere similarity of job title is sufficient grounds to conclude that differential treatment of the two groups is pretextual. Cf. Fallis, 944 F.2d at 745 (to establish pretext, plaintiff geologist has burden to show that

---

[9] Job grades are entirely distinct from performance grades. The former refers to an employee's positional rank within a given job grouping; the latter to an assessment of their job capabilities.

younger geologists held to lower standard had same "duties or responsibilities"). Likewise, the mere assertion, without any evidentiary support, that employees in the two codes performed the same tasks is insufficient to defeat summary judgment. See Fed. R. Civ. P. 56(e).

Clark also points to an internal Seagate memo about the RIF from Human Resources which notes: "The potential exists that within several grades of employees that have like skill sets, longer service employees may be released and lesser service employees, lesser grades, and lesser skills could be retained." See Appellants' App. at 581. Like the similarity of job title, this is certainly suggestive of pretext, but is insufficient without more to establish the separation of job codes 1432 and 1433 as pretextual. First, there is no indication that the above statement refers to those codes. Second, even if it does, the separation of employees with the same "skill sets" does not indicate that the separated groups perform the same functions. It may indicate that one set of employees can do the other's jobs, but not that it actually does so. Appellants may believe that Seagate's job coding should be by job qualification, not function performed, but it is not our place to disturb that kind of business judgment.

However, the evidence submitted by Clark does not stand alone. Critically, Jerlene Bush and Mildred Bobo, both within job code 1433, testified that at the time of the RIF, they trained two employees, Carolyn Muse and James Russell

- 28 -

Hunter, who then replaced them in their positions.  See Appellants' App. at 496-98.  Yet Hunter was placed in job code 1432, see id. at 171, and Muse in 1402, see id. at 170.[10]  Muse's placement in another job code generally raises questions about the claimed functional differences between job codes.  But Hunter was placed into the very job code that plaintiffs argue was pretextually separated from their own code for purposes of discrimination.  On the basis of personal observation, two witnesses from job code 1433 testified that they trained someone to perform their jobs and that the person they trained was placed in job code 1432.  That is sufficient for a reasonable jury to find Seagate's differentiation of the two codes pretextual.

As a consequence, McCartney's retention creates a genuine issue of material fact sufficient to preclude the entry of summary judgment against Clerk's claim of race discrimination.  However, Seagate correctly observes that Clark's comparison to McCartney cannot support a claim of age discrimination because McCartney was 66 years old at the time of the RIF, fifteen years older than Clark.

---

[10]     Bush and Bobo's testimony does not clearly identify Hunter as one of the two trainees.  They both referred to a "Russell Hawna."  See Appellants' App. at 497.  "Hawna," however, was not their spelling, but is simply the transcription made by the reporter; in fact, they were not asked by counsel to spell the name of the person they identified.  Despite this apparent confusion, the district court, see Appellants' App. at 1083, and Seagate, see id. at 1006, have both characterized the testimony as referring to the James Russell Hunter placed in job code 1432, and appellants do not challenge this characterization on appeal.  We see no reason not to follow the unanimous characterization of this evidence.

But, having established a sufficient basis to find the differentiation of job codes 1433 and 1432 pretextual, Clark can substantiate her claim of age discrimination by pointing to any retained employee in job code 1432 who is younger than she, less senior, and rated as a three on the CHAPA report. There is no shortage of such employees. See Appellants' App. at 170-72. Thus, there are genuine issues of material fact that preclude the entry of summary judgment against Clerk's claim of age discirmination.

3.    Mildred Bobo, Jerlene Bush and Claudia Johnson

Like Clark, these three plaintiffs were all selected for termination from job code 1433, all of them scored three on the CHAPA report, and all three can legitimately establish age and race discrimination by pointing to younger, white employees retained in job code 1432. Like Clerk's, therefore, their claims present genuine issues of material fact sufficient to preclude the entry of summary judgment against them.

In addition, Johnson establishes pretext by raising the inference that her final CHAPA score, which is dated June 28, 1993, see Appellants' App. at 173, may have been manipulated. Plaintiffs submitted a number of "Employee Evaluations," see id. at 631-764, including one for Johnson that is dated July 13, 1993, which is after the claimed date of her final CHAPA evaluation, id. at 631. This document lists Johnson's "Last Performance Rating," dating from December

- 30 -

28, 1992, as a four, and states that Johnson has since "continued to perform at the same rating level." Id. The discrepancy is startling, and not only to us.[11] More than two weeks after the performance evaluation on which Seagate claims to have based its lay-off of Johnson, the company was describing her as continuing to perform at a four rating. Johnson's submission raises the necessary inference of pretext, and her claims therefore survive Seagate's motion for summary judgment.[12]

4.      Maudie Beaird

Beaird was in job code 9104, from which fifteen employees were terminated, ostensibly pursuant to operational requirements. Only one employee

---

[11]      In an internal Seagate memo dated July 23, 1993, the Human Resources Department notes its concerns that certain "Employee Evaluation[s]" of projected change in performance and potential—presumably a reference to the "Employee Evaluations" submitted in Appellants' App. at 631-764, which project changes in performance and potential ratings—may not agree with the "July 26 appraisals"—presumably a reference to the final CHAPA report ratings, many of which are dated July 26, 1997. See Appellants' App. at 590. The memo asks: "Should the employee evaluation agree with the July 26 appraisal?" Next to this question, someone has written: "Yes—why wouldn't it?" Id. That response, which appears to have been written by someone at Seagate, compare Appellants' App. at 590 with id. at 582 (demonstrating that other such annotations are incorporated into later drafts of the same document), does nothing to alleviate the suspicion of mendacity raised by Johnson.

[12]      In its reply brief, Seagate attempts to explain this discrepancy. Even assuming that such explanation is properly before us, it cannot be dispositive of Johnson's claim. Seagate argues that Johnson's Employee Evaluation confirms her 3 rating. That is one possible interpretation of the document. But drawing all inferences in favor of the non-movant, as we are required to do, we cannot discount Johnson's proposed interpretation.

in this code scored a two on the CHAPA report, and Beaird was therefore terminated as the thirteenth most junior 9104 employee to have a CHAPA score of three. See Appellants' App. at 203.

Most of Beaird's arguments for pretext are plainly without merit. For instance, she contends that her final and controlling performance appraisal was carried out by a supervisor who had discriminated against her in 1990. However, the record contains little to suggest discrimination was involved in the 1990 incident. The only evidence Beaird has in support of this claim is that the Human Resources department responded adequately to her complaints in 1990; but that does not mean the department determined discrimination was involved.

Beaird does point out the anomaly between Exhibit 53, which, for her job code, lists Eugene Fischer for termination with a score of three, see Appellants' App. at 796, and the CHAPA report, which rates Fischer as a four, see id. at 203, and therefore determines his retention. That anomaly does not itself suggest pretext. Seagate claims to have used the latest available performance appraisals for RIF purposes, which means that final lay-offs may differ from those listed in Exhibit 53 without evidencing pretext. But Seagate's position does not fully explain Fischer's retention. His CHAPA rating of four is dated November 2, 1992. See id. Exhibit 53, which gives his rating as a three, was evidently

compiled well after that date because it contains a three rating for Walter Johnson, which the CHAPA report dates from June 28, 1993. See id. at 203, 796.

The anomaly therefore raises the inference that Fischer's latest, Exhibit 53-listed score was ignored in favor of a preexisting four-rating, thus preventing his lay-off. That the stated reason for Fischer's retention may have been pretextual does not mean, however, that Beaird's lay-off from the same job code is also suspect. Certainly, an employer's failure to apply objective RIF criteria to a third party may sometimes establish that that employer was not guided by the RIF criteria in an individual plaintiff's case. Pointing to a third party could show pretext if, for instance, the RIF involved a small number of people or if there are a substantial number of third parties to whom the plaintiff can point. But where, as here, a plaintiff identifies only one third party from the relevant pool of 30 employees, she fails to put forth sufficient evidence that the employer's nondiscriminatory reason in her specific case is "unworthy of belief." Randle, 69 F.3d at 451. Beaird's claim is at best "colorable" and therefore does not survive summary judgment. See Anderson, 477 U.S. at 249-50.

5.     Margaret Jones

Jones was employed in job code 1032, from which a total of 116 employees were laid off by Seagate to meet operational requirements. Jones scored a three on the CHAPA report; others with that score were retained, but all had worked for

Seagate for a longer period of time. Aside from pointing to retained employees with lower point scores, which, as we have noted, does not establish pretext, Jones makes two arguments in support of her claim.

First, she points to Seagate's selective use of potential as a RIF criterion. Seagate claims to have followed the RIF criteria listed in its employee handbook, see Appellants' App. at 219, which states unequivocally that, for RIF purposes, Seagate will take into account "operational requirements, performance and potential. Where these factors are equal, length of service will be taken into account." Id. at 321. Yet, in identifying employees to be laid off in job code 1032, Seagate first utilized the criteria of operational requirements and performance. If those two were equal, they looked to seniority as a tie-breaker without considering potential. See id. at 323. Thus, their selection method deviated from their stated policy. That deviation disadvantaged Jones because, as a three-performer with potential, see id. at 632, she would not have been laid-off if Seagate had used potential to rank those in her job code who also scored three on the final CHAPA listings.

Other things being equal, that deviation might evidence pretext. Here, however, it appears that Seagate effectively abandoned its stated policy of considering potential. See id. at 220-21. If uniformly applied, that shift in policy would not evidence pretext because no employer is required to follow its

previously stated policies.  See Jones v. Unisys Corp., 54 F.3d 624, 632 (10th Cir. 1995).  But, Seagate did not abandon potential altogether.  There is material in the record indicating that, in some job codes, potential was factored into the RIF decision.  See Appellants' App. at 775-79.  Moreover, on at least a number of occasions, potential was used where a manager could document the greater potential of a less senior employee.  See id. at 776.  That raises an inference, albeit not a strong one, that potential was used selectively to benefit younger employees.  Cf. Mohammed v. Callaway, 698 F.2d 395, 399 (10th Cir. 1983) ("disturbing procedural irregularities" may evidence pretext).  Accordingly, Seagate's decision to ignore Jones's recorded potential constitutes limited evidence of pretext.

Jones's second argument is based on a one-page, hand-written submission dated July 28, 1993, and headed "Rating Deviations," which lists Jones as going from a performance grade of four, which would have resulted in her retention, to a grade of three, which did result in her termination.  See id. at 627.  Because the CHAPA report lists her last three evaluations as threes (or the point equivalent thereof), see id. at 167, this document raises the inference that Jones achieved a four rating that was suppressed for purposes of including her in the RIF.[13]

---

[13]     The inference is strengthened by a series of notes apparently prepared by

None of this evidence, when considered separately, provides a clear indication of pretext. However, we are required to consider the totality of such circumstantial evidence, see Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 338 (1st Cir. 1997); Graefenhain, 827 F.2d at 19, and that does question Seagate's proffered explanation for Jones's termination. Jones can therefore substantiate her claims sufficiently to survive summary judgment.

Finally, there remains the question, unaddressed by the district court, of whether Jones's claims are timely. The defendant objects that Jones's claims are

_____

Seagate management. See id. at 780-87. The notes, written in a Seagate "Business Diary," id. at 780, state that:

> [t]he people who are affected by the RIF will not get a perf. app. They will
> get the forecasted merit — which was planned in July. This is being done
> to keep managers from deviating from the forecasted perf rating &
> changing the merit amount.

Id. at 783. One implication of this note is that Seagate was concerned that an employee's CHAPA-listed performance rating might deviate from the performance rating projected by an earlier "Employee Evaluation." Any such deviation might raise an inference of deliberate rating manipulation, as occurred in Johnson's case. See supra Section III.B.3. The note suggests that the solution to this potential problem was to ensure that employees to be terminated "get the forecasted merit" contained in their "Employee Evaluation," thus eliminating the potential for any deviation between their projected and final performance evaluation.

That reading of the note would then explain the "Ratings Deviation" listing as consisting of employees whose final ratings initially differed from those projected. Jones's being listed as a "4 to 3" would fit this pattern because her "Employee Evaluation" had projected a three rating. See id. at 632. The only other employee placed on the "Ratings Deviation" list for whom the record contains an Employee Evaluation is Sandra Moore. She also fits this pattern. Listed as a "4 to 3" on the Ratings Deviation, she had been projected to earn a three on her "Employee Evaluation." See id. at 627, 638.

- 36 -

barred because they were filed with the Equal Employment Opportunity Commission ("EEOC") more than 300 days after Seagate notified her that she was to be included in the RIF. See 29 U.S.C. §§ 626(d)(2) & 633(b); see also Aronson v. Gressley, 961 F.2d 907, 911 (10th Cir. 1992) ("A timely filing with the EEOC is a prerequisite to a civil suit under . . . the ADEA."); Hulsey v. Kmart, Inc., 43 F.3d 555, 557 (10th Cir. 1994) (ADEA claims accrue on date employee notified of adverse employment action); Appellant's App. at 145 (Jones notified on August 2, 1993, that she would be terminated under RIF); id. at 133 (Jones's charge to EEOC, dated July 19, 1994).

We agree that Jones's claims were not filed within the stated period, but that does not necessarily mean they are time-barred. Because the timely filing of a discrimination charge with the EEOC is not a jurisdictional prerequisite to a suit in federal court, it is best likened to a statute of limitations and is therefore subject to waiver, estoppel and equitable tolling. Richardson v. Frank, 975 F.2d 1433, 1435 (10th Cir. 1991). The trial court made no discernible ruling on these equitable issues. We are therefore reluctant to affirm summary judgment given that no apparent evidentiary hearing was held below to determine their potential application to Jones's case. See Wilkerson v. Siegfried Ins. Agency, Inc., 621 F.2d 1042, 1045 (10th Cir. 1980); see also Delmar v. Raytheon Aircraft Corp., No. 96-1002-JTM, 1996 WL 499144, at *7 (D. Kan. Aug. 9, 1996) (denying

summary judgment to employer because Tenth Circuit cases "indicate a detailed factual inquiry is necessary to determine whether equitable tolling should be applied," requiring "[i]n all likelihood, an evidentiary hearing"). Consequently, we vacate the grant of summary judgment to Seagate on Jones's ADEA claim, and remand to the district court to determine, in the exercise of its equitable discretion, whether Jones's claims should be heard.

6.    William Henson

Henson was employed in job code 276X. Nine employees were terminated from this section because of alleged operational requirements. As the only 276X employee to have scored a two on the CHAPA report, Henson was the first to be terminated.

Henson testified that prior to the lay-off and "during the time we got our lay-off notice," Seagate was advertising open positions within his job code. See Appellants' App. at 519. That claim is borne out by the record. See id. at 578 (open position in Henson's job code that was posted on June 28, 1993, still open on July 28, 1993); id. at 857-60 (August 1993 postings of at least three open positions in Henson's job code and grade). A factfinder could therefore legitimately conclude that Seagate was hiring into positions similar to Henson's at the very time it claimed the elimination of positions such as Henson's was operationally required. That conclusion is certainly sufficient to support a finding

of pretext. Defendant's reliance on <u>Furr</u>, 82 F.2d at 985-86, and the district court's on <u>Fallis</u>, 944 F.2d at 745 n.2, are misplaced. In both those cases, there was no evidence that the employer was hiring into similar positions at the same time that it discharged the plaintiff. Thus, as to job code 276X, Henson presents sufficient evidence of the pretextual nature of the RIF to defeat summary judgment.[14]

## IV

All of the appellants have presented claims of wrongful discharge in violation of Oklahoma's public policy against discrimination. The district court granted summary judgment to Seagate on appellants' state law claims because it held that no state claim could lie on facts that did not also support a federal claim. Given our holding that the federal claims are generally sufficient to survive defendant's motion for summary judgment, we cannot, for the most part, affirm summary judgment as to the state claims unless a separate basis to do so exists under state law. It does.

---

[14] Seagate argues that Henson could not have obtained any of these positions because of his two rating. But it is the very existence of those jobs, regardless of Henson's ability or odds of acquiring them, that questions Seagate's ostensible reason for laying off employees from job code 276X. Put bluntly, it is hard to argue convincingly that simultaneous elimination of and hiring for similarly-situated positions is operationally required.

Appellants' age-based claims are barred because they are based on their status rather than their actions, and because the ADEA provides an adequate remedy for the discrimination charged. See List v. Anchor Paint Mfg. Co., 910 P.2d 1011, 1014-15 (Okla. 1996).

Beaird's gender-based state claims also fail. Although an earlier case had allowed public policy suits for racial discrimination because of the relative inadequacy of Title VII remedies, see Tate v. Browning-Ferris, Inc., 833 P.2d 1218, 1223 (Okla. 1992), the Supreme Court of Oklahoma has held that post-Tate amendments to Title VII have rendered the statute adequately remedial, thus barring suits for wrongful termination in violation of Oklahoma's public policy against gender discrimination. See Marshall v. OK Rental & Leasing, Inc., 939 P.2d 1116, 1122 (Okla. 1997).

In light of List and Marshall, appellants' race-based claims must also fail. The post-Tate Title VII amendments similarly improve the remedies available for race-based claims, and Marshall must therefore bar suits for wrongful termination in violation of state public policy against racial discrimination. Cf. Cassel v. Webco Indus., Inc., 942 F. Supp. 1409, 1412 (N.D. Okla. 1996) ("[List's] analysis applies equally to wrongful discharge cases that could be brought pursuant to Title VII, because the remedies available under Title VII are identical to those afforded by the ADEA.").

- 40 -

# V

All the appellants, with the exception of Beaird, present sufficient evidence of pretext to establish genuine issues of material fact precluding the entry of summary judgment against their federal claims of discrimination. With regard to Beaird, the district court's grant of summary judgment to Seagate is **AFFIRMED**. With regard to the other appellants, the district court's grant of summary judgment is **REVERSED** as to all federal claims of discrimination, save for the claim of age discrimination brought by appellant Jones, as to which we **VACATE** and **REMAND** for further proceedings consonant with the views herein expressed. The district court's grant of summary judgment to Seagate is **AFFIRMED** as to all state claims.

**96-6087, Beaird v. Seagate Technology, Inc.**
**TACHA, J.**, concurring in part and dissenting in part.

I concur in the judgment, except with respect to plaintiff Ruth Noran. I write separately to express my view that this Circuit's treatment of pretext evidence has inappropriately circumscribed district courts' powers under Rule 56 of the Federal Rules of Civil Procedure.[1]

In a discrimination suit, once a plaintiff has made a prima facie showing of discrimination and the defendant has rebutted the presumption created by that showing with a legitimate, nondiscriminatory reason for the employment decision, this Circuit has held (as the majority does today) that if the plaintiff employee then advances evidence that the defendant's alleged nondiscriminatory reasons are pretextual (i.e. unworthy of belief), the defendant employer cannot succeed at the summary judgment stage. See Ingels v. Thiokol Corp., 42 F.3d 616, 622 (10th Cir. 1994). I believe the proposition that an employer can never succeed at summary judgment upon a plaintiff's showing of pretext is inconsistent with Rule 56 and is not, as we have presumed, dictated by Supreme Court precedent.

It is my conclusion that to defeat summary judgment in an employment discrimination suit, a plaintiff must present evidence that (1) creates a genuine issue of

---

[1] The standards for a summary judgment motion under Rule 56 are the same as a Rule 50 motion for judgment as a matter of law at the conclusion of trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). Some of the circuits that have held as I propose here have articulated their rule upon review of a Rule 50 motion. See, e.g., Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 994 (5th Cir. 1996) (en banc). For the sake of brevity, I refer only to Rule 56.

material fact as to whether the employer's stated reason was not actually what motivated the employer *and* (2) from which a reasonable juror could infer that unlawful discrimination was a determinative factor in the plaintiff's termination. See Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 994 (5th Cir. 1996) (en banc); Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 440-441 (11th Cir. 1996) (per curiam), cert. denied, 117 S. Ct. 2511 (1997); Woods v. Friction Materials, Inc., 30 F.3d 255, 260 n.3 (1st Cir. 1994); but see Sheridan v. DuPont, 100 F.3d 1061, 1067 (3d Cir. 1996). Not only must the plaintiff produce evidence of pretext, but the pretextual evidence must be of a nature or quality from which a reasonable jury could infer illegal discrimination. This is a legal determination required by Rule 56.

Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995), is the case in which we most completely articulated the rule that a district court must always deny an employer's motion for summary judgment upon the plaintiff's showing of pretext. Id. at 451-53. In that case, we were faced with the question whether a plaintiff asserting employment discrimination "must come forward with some direct evidence that the [employer] was motivated by an illegal discriminatory animus" in order to survive summary judgment. Id. at 451. Such a requirement has been termed the pretext-plus approach. See Marx v. Schnuck Markets, 76 F.3d 324, 328 (10th Cir. 1996). In Randle, we concluded that a plaintiff does not need to produce direct evidence of discrimination to survive summary judgment. I am in full agreement with that conclusion and this Circuit's rejection of the

pretext-plus approach. The federal discrimination statutes do not require a plaintiff to provide direct evidence of illegal discrimination. Direct evidence is "[e]vidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption." BLACK'S LAW DICTIONARY 316 (abr. 6th ed. 1991). Our rejection of the pretext-plus standard, however, should only be read as a rejection of the requirement that a plaintiff must produce such direct evidence of discrimination. Rejection of the pretext-plus standard does not and should not relieve a plaintiff of the burden of proffering evidence that is in some regard probative of the defendant's alleged discriminatory motive. Yet, that is exactly what the language of Randle and other cases in this Circuit have done. Although we should not require direct evidence of discrimination, we should always require good evidence—evidence from which a reasonable juror could infer illegal discrimination—for a plaintiff to be able to prevail.

The question I raise here, then, is whether a plaintiff who has presented evidence from which a court could conclude that an employer's proffered nondiscriminatory reason is pretextual (i.e., unworthy of belief) has necessarily established pretext upon which a jury could infer discriminatory motive. I think the answer to the question is clearly no. We have never addressed this question squarely, even though the language of our cases seems to preclude such an approach. See, e.g., Randle, 69 F.3d at 452 n.17, 453; Ingels, 42 F.3d at 622. We would not place an excessive or impermissible burden on plaintiffs by requiring pretext evidence to be of such a nature or quality that a reasonable jury could

infer discriminatory conduct.  Indeed, in considering a summary judgment motion, the court must view the evidence and inferences in the light most favorable to the employee-plaintiff.  See Zimmerman v. First Fed. Sav. & Loan Ass'n, 848 F.2d 1047, 1051 (10th Cir. 1988).

For a case to proceed beyond the summary judgment stage, there must be a "genuine issue as to any material fact."  F.R.C.P. 56(c).  If a plaintiff's evidence of pretext is not legally sufficient to support any inference of illegal discrimination, there is no genuine issue of any material fact, and the case should not go to the jury.  Cf. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988) ("Because no reasonable inference of a property or liberty interest can be drawn from [the] complaint and supplemental evidence, summary judgment is appropriate as to the due process claims.").  If, on the other hand, the plaintiff's evidence of pretext does support an inference of discrimination, there is a genuine issue of material fact and the court must send the case to the jury.  The factfinder's role is not compromised in any regard.

In an employment discrimination suit, the factfinder's task is to determine whether an employer was motivated by discriminatory animus, but the factfinder can only consider the evidence if the evidence is legally sufficient to support such a finding of discrimination.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986) (holding that "the inquiry . . . [at summary judgment is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law"). The rule in this Circuit, however, is that an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's proffered reason for the employment action. See Randle, 69 F.3d at 451 n.15. This per se rule precludes a district court from engaging in a separate inquiry into whether that evidence is legally sufficient to support a finding of discrimination. It is this per se rule that I take issue with here. Merely because a plaintiff has proffered evidence of pretext does not and should not mean that her evidence is necessarily legally sufficient to support a finding of discrimination. In my judgment, adherence to this per se rule eviscerates the requirement of Rule 56 and the Supreme Court's Liberty Lobby decision that there must be a genuine issue of material fact for the case to proceed beyond summary judgment.

An example from this case will help illustrate my point. Plaintiff William Henson was terminated from job code 276X, along with eight other employees. Henson established a prima facie case of discrimination. Defendant Seagate proffered as its nondiscriminatory reason for the lay-off that operational requirements dictated a reduction of nine employees in that job code. Then, Henson presented evidence that immediately prior to and during the lay-off, Seagate was advertising for four open positions in the same job code. On these facts, there is sufficient evidence to disbelieve Seagate's proffered reason for the lay-off. Henson has established pretext. Furthermore, at the time of the layoff, Henson was 52 years old. Of the other eight employees that

Seagate terminated, four were over 40 years old. Because several of the terminated employees were above age 40, the pretext evidence and its surrounding context are such that a juror could reasonably infer that age was a determinative factor in Seagate's employment decision. Thus, the additional facts help to create a genuine issue of material fact about whether Seagate illegally discriminated against Henson. The question should go to the jury, which will make the ultimate decision whether or not to draw an inference of illegal discrimination.

If we change the facts, though, I think the conclusion also changes. If Henson had been the only employee of the nine terminated who was over the age of 40, there would no longer be a genuine issue of material fact. There would still be sufficient evidence to disbelieve Seagate's proffered reason for the lay-off because at the same time of the RIF, the company was advertising for positions in the same job code from which it was laying off workers. Thus, Henson would still have established pretext. In my judgment, though, there would be no genuine issue of material fact for trial because a jury could not reasonably conclude, on this evidence alone, that unlawful discrimination was a determinative factor in the plaintiff's termination. Discrimination comes in many shapes and sizes, but some sizes and shapes are too peculiar to support a jury verdict without additional or better evidence. The majority's assertion that we cannot consider Seagate's treatment of other employees misses my point. See maj. op. at 12 n.2. We have an obligation to consider the quality of the pretext evidence that the plaintiff proffers. See

- 6 -

Liberty Lobby, 477 U.S. at 254 (requiring summary judgment courts to evaluate the "quality and quantity" of the plaintiff's evidence). The majority suggests that a plaintiff should prevail at summary judgment unless there is no "possible inference of [discriminatory animus] to be drawn from" her pretext evidence. Maj. op. at 12 n.2. I disagree. To succeed at the summary judgment stage, a plaintiff must present pretext evidence that supports a <u>reasonable</u> inference of discrimination. Merely because an inference of discrimination is possible does not make it reasonable. In the facts of my hypothetical, while I acknowledge that an inference of discrimination is possible, I do not think that such an inference is reasonable given that the plaintiff was the only employee of the nine terminated who was over the age of 40.

This interpretation of Rule 56 in the employment discrimination context ensures that an employer will not be held liable for conduct that is not prohibited by the discrimination statute at issue. There is, of course, always a risk that a jury will incorrectly find an employer liable for discrimination because such cases always require the jury to consider conflicting evidence and evaluate the credibility of witnesses. The risk that a jury will make an incorrect finding is greatly increased, however, when the court is precluded from evaluating whether the evidence creates a genuine issue of material fact as to the ultimate question at issue in the case, namely, whether discrimination occurred. <u>Cf. Rhodes</u>, 75 F.3d 989 at 993 (concluding that when plaintiff has established pretext, "we are convinced that ordinarily [a verdict for plaintiff] would

be supported by sufficient evidence, but not always.  The answer lies in our traditional sufficiency-of-the-evidence analysis.").

We have presumed, as have some other circuits, that in <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993), the Supreme Court foreclosed the approach that I suggest here.  Indeed, <u>Hicks</u> is the case from which our Circuit developed its current rule on pretext at the summary judgment stage.  <u>See</u> <u>Randle</u>, 69 F.3d at 451.  <u>Hicks</u> addressed whether*,* following a bench trial, a court must necessarily enter judgment for an employee-plaintiff upon a finding that the reasons offered by the employer for the employee's discharge were pretextual.  The Court concluded that despite a factual finding of pretext, a plaintiff is not necessarily entitled to judgment as a matter of law, and the employer may prevail if the factfinder is also convinced that the employer was not motivated by discriminatory animus.

The Court, however, did not address the question that I pose here: whether, despite a showing of pretext, the court can enter judgment as a matter of law for the employer at the summary judgment stage.  The following oft-quoted language from <u>Hicks</u> is the source of the disagreement on this question:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) *may*, together with the elements of a prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, . . . [and] upon such rejection, "[n]o additional proof of discrimination is required . . . ."

<u>Hicks</u>, 509 U.S. at 511 (emphasis added). The Eleventh Circuit concluded, I think correctly, that "[t]he first sentence of this passage shows that disbelief of the employer's proffered reason may (and by implication, may not) be enough for a plaintiff to overcome an employer's motion" for summary judgment. <u>Isenbergh v. Knight-Ridder Newspaper Sales, Inc.</u>, 97 F.3d 436, 436 (11th Cir. 1996) (per curiam), <u>cert. denied</u>, 117 S. Ct. 2511 (1997). The Court's use of the term "permit" in the second sentence also indicates that the inference of discrimination upon evidence of pretext is allowed, but not mandatory. <u>See id.</u> The two sentences, "when read together, at least strongly suggest that rejecting the employer's proffered reason is not <u>always</u> sufficient to allow a finding of discrimination, although <u>sometimes</u> . . . it might be." <u>Id.</u> (emphasis in original). The language from <u>Hicks</u> is not so emphatic as to require courts to automatically deny a defendant's summary judgment motion when pretext has been established. Thus, I agree with the sensible interpretation of this language from *Hicks* offered by a noted commentator:

> [T]he Court made these statements in the context of a fully tried case. It was the plaintiff who wanted judgment as a matter of law, in order to stop the factfinder from considering the full range of evidence, including evidence undercutting the inference of intentional discrimination. The Court only said that this effort to block consideration of all the evidence must fail. The Court did not purport to limit the availability of summary judgment to *either* party upon consideration of *all* of the evidence relevant to pretext. Indeed, the Court stressed in *Hicks* that once a McDonnell Douglas-Burdine case reaches the pretext stage, it is to be treated like any other civil case. Nothing in *Hicks* remotely suggests that the Court is of the general view that questions of intent cannot be resolved through summary judgment.

- 9 -

Deborah C. Malamud, The Last Minuet:  Disparate Treatment After *Hicks*, 93 Mich. L. Rev. 2229, 2305 (1995).

The Supreme Court's ultimate conclusion in Hicks was that in some cases, even though facts are established at trial that cause the factfinder to disbelieve the employer's proffered reason for its employment action, application of the law to those facts will result in a jury verdict for the employer.  See Hicks, 509 U.S. at 508-11; Isenbergh, 97 F.3d at 442 .  The Supreme Court in Hicks "did not contract, but expanded, the universe of discrimination cases where judgment for employers would be permissible."  Id. at 443.  Thus, I also agree with the Eleventh Circuit in its conclusion that—

> the Supreme Court would not declare such an important new rule—the rule which [Randle] sees in Hicks—in a case in which the new rule plays no vital part in the decision . . . .  [T]he Supreme Court would have set out such an important new rule—one that, in effect, partly nullifies two of the Federal Rules of Procedure [i.e., Rules 50 and 56]—conspicuously and plainly so that no Article III judge could miss it.

Isenbergh, 97 F.3d at 442.

Notwithstanding my above homily, with respect to plaintiff Noran, I do not even think she has proffered sufficient evidence to establish pretext.  The majority relies on Exhibit 53 as evidence of pretext as to Noran.  Exhibit 53 was a preliminary document compiled by Seagate in which the company was attempting to gather a large quantity of information regarding thousands of employees in order to identify which employees should be terminated in the reduction in force.  The CHAPA report contains the final list of employees terminated in the RIF.  According to the CHAPA report, most of the

employees, though not all, targeted for termination in Exhibit 53 were ultimately terminated in the RIF. In my judgment, nothing in Exhibit 53 suggests that Seagate was untruthful in implementing the RIF criteria generally or with respect to Noran. Our decision in Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988), requires the nonmovant's evidence of pretext to be "specific" and "probative." In my judgment, Exhibit 53 is not "probative" of pretext. Exhibit 53 contains mistakes and inconsistencies that any preliminary document would contain when a business is attempting to compile large amounts of data on its workforce. The majority states that this "alternative inference . . . is certainly permissible, but it is not our role to choose among reasonable inferences." Maj. op. at 24 n.7. In evaluating this evidence, even drawing all inferences in favor of Noran, I find that Exhibit 53 does not provide any reasonable basis to believe that Seagate's proffered reason for Noran's termination—the RIF and its implementing criteria—is untrue. I merely disagree with the majority regarding the probative value of Exhibit 53. Thus, I would hold that Noran has not proffered any evidence of pretext.

I concur in the judgment, except with respect to plaintiff Noran.